IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HASSAN A. ABDULBAQI, III,            )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          2:24cv369
                                     )          **Electronic Filing**
UNITED STEELWORKERS,                 )
                                     )
          Defendant.                 )

## MEMORANDUM OPINION

Hassan A. Abdulbaqi, III, ("plaintiff") commenced this action against United Steel Workers ("defendant" or the "union") seeking redress for disparate treatment and hostile work environment based on national origin discrimination in violation of Title VII. Presently before the court is defendant's motion for summary judgment.[1]   For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(A).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  Deciding a summary judgment motion requires the court to view the facts,

---

[1]  In response to defendant's motion for summary judgment, plaintiff has withdrawn his claim for retaliation.

draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. Of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuiune only if the evidence is such a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" … "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the

non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the factual record below. Plaintiff is a Saudi national. Defendant is a labor organization with its headquarters in Pittsburgh, Pennsylvania. Plaintiff began employment with defendant as a student intern while enrolled in a master's in human resources and employment relations program at Indiana University of Pennsylvania ("IUP"). In addition to human resources coursework, he had earned a master's in business administration from IUP in 2021. Plaintiff's status as a student authorized him to work in the United States through an F-1 student visa. To confirm his authorization, plaintiff provided defendant with an I-94 form. Upon completing his degree in December of 2022, plaintiff lacked authorization to work in the United States. He continues to lack authorization to work in the United States.

Defendant placed plaintiff in the Collective Bargaining, Research and Benefits Department known as the "collective bargaining department." Mike Yoffee led the department and supervised all its employees. Defendant considers all student interns, including those in collective bargaining, to be "casual employees." Thus, all student interns are employed in an at-will basis for a temporary period. Additionally, student interns are not a party to any bargaining unit represented by a union.

Ginger Hartman, the union president's chief of staff, approved every internship and internship extension with collective bargaining. Defendant made all employment offers in writing and the decision to hire an employee ultimately rested with defendant's president. Yoffee

3

did not possess authority to hire an employee or sponsor work visas. Further, defendant had never hired a student intern for a permanent role in collective bargaining or sponsored an intern for a work visa.

During his internship, plaintiff received work assignments from Yoffee and occasionally Robert ("Bob") Clark. Clark worked in the collective bargaining department as a technician. Defendant tasked Clark with summarizing and compiling a record of labor arbitration awards from defendant's files. Under Clark's supervision, plaintiff assisted on this project. Under Yoffee's supervision, plaintiff received various assignments such as archiving files of retired collective bargaining employees.

Plaintiff worked partially remote and in-office. When in office, plaintiff utilized a conference room for his office. The conference room contained several bookshelves filled with books, union files, and boxes containing union files. Other employees occasionally entered the conference room to access the union files.

Defendant operated its internship program in semester-like windows. Plaintiff interned for three successive windows from May of 2022 through March of 2023. Unbeknownst to plaintiff, during the fall internship-window in September of 2022, defendant had listed a job opening for an administrative assistant on Indeed.com. Defendant received an application from Elizabeth McKay, a white woman. While plaintiff was still a student at IUP, defendant interviewed and hired McKay. Plaintiff did not apply for the position.

Additionally, defendant employed another IUP student intern, Rachel Johnson, during the same timeframe it employed plaintiff. Johnson is a white woman. Like plaintiff, Johnson worked partially remote and in-office. When in office, she shared the conference room with plaintiff. On August 22, 2022, Yoffee emailed plaintiff and directed him not to work the following day because plaintiff had exhausted the 120-hour monthly budget the collective

4

bargaining department allocated to interns.  Defendant's payroll records reflect that on August 30, 2022, it paid plaintiff for 14 hours worked and Johnson for 8 hours worked in the final week of August.

Similarly, defendant instructed plaintiff to cease working for the final week of December because defendant closed for the end of year.  Johnson texted plaintiff to notify him that she had also been told to cease working for December of 2022.  Defendant's payroll records reflect that it paid Johnson for a total of 22.5 hours worked in December and it paid plaintiff for 72 hours in December.  Payroll records also indicate that beginning in September of 2022, plaintiff received an hourly wage of $18 and Johnson received an hourly wage of $15.

In the second week of December 2022, plaintiff spoke with Yoffee about long-term employment prospects.  Clark observed the conversation.  Yoffee inquired about plaintiff's employment objectives such as whether he wanted to work in human resources.  Plaintiff informed Yoffee that he simply wanted to work and had interest in a position with human resources.  Yoffee then intimated that he would conduct due diligence into potential employment opportunities.  Defendant does not have a human resources department.  Rather, the personnel department handled defendant's human resources matters.  The personnel department did not list any job openings between December of 2022 and June of 2023.

Following the conversation, Yoffe emailed Hartman on December 20, 2022, stating that plaintiff had recently graduated and sought full-time employment.  Additionally, Yoffee asked Hartman to extend plaintiff's internship for an additional three months or until he found full-time employment.  Hartman granted the extension.  Defendant formalized the extension in a casual employment form that indicated plaintiff's employment would continue from January 1, 2023, until March 31, 2023.  Yoffee also confirmed via email that defendant had granted plaintiff access to its computer systems through March 31, 2023.

5

On January 6, 2023, Yoffee asked plaintiff whether he sought citizenship.  Plaintiff responded that he wanted to work and requested that Yoffee inform United States Customs and Immigration Services ("USCIS") of his employment.  Yoffee then asked plaintiff if there was anything else and plaintiff explained that he wanted his visa changed from a student visa to a work visa.  Yoffee did not comment on whether defendant could fulfill plaintiff's request and instead encouraged plaintiff to learn more about the visa process.

On March 14, 2023, Clark orally informed plaintiff that his internship had to conclude on March 31, 2023.  In response, plaintiff expressed a desire to remain employed with defendant.  Clark assured plaintiff he would inquire as to whether that were possible.  Clark then relayed plaintiff's request for an internship extension to Yoffee.  Yoffee told Clark that plaintiff must produce a copy of his visa if plaintiff were to be extended.  Clark conveyed Yoffee's message to plaintiff and on March 15, 2023, plaintiff provided defendant a copy of his visa.

Later that same day, Hartman moved forward with extending plaintiff's internship for an additional month until April 28, 2023.  Clark relayed the news to plaintiff.  In this conversation, plaintiff expressed frustration that defendant had hired Elizabeth McKay to an administrative assistant position.  He also voiced dissatisfaction that defendant had not hired him for a permanent position with human resources.  Plaintiff questioned Clark regarding why defendant hired McKay, to which Clark responded that he would not answer the question.  This is the first time plaintiff articulated displeasure regarding McKay's employment.

Yoffee also emailed plaintiff on March 15, 2023, to extend the internship formally.  In response, plaintiff wrote that he appreciated the extension but felt that defendant had promised him an HR position and an H1B visa or citizenship.

Plaintiff reported that he experienced several instances of harassment both before this conversation and after.  First, he had perceived a shift in attitude towards him prior to the March

6

15th conversation when Yoffee tasked plaintiff with inventory and cataloguing union files that included documents in French. Plaintiff does not speak French. He attempted to complete the assignment to the best of his ability using a translation app on his personal phone. Upon determining that he could not complete the assignment, plaintiff emailed Yoffee. Yoffee responded "okay."

In another instance, plaintiff arrived at his office to find that a screw had been loosened from his desk. Plaintiff did not witness anyone remove the screw. Plaintiff is certain however, that Yoffee removed the screw as an act of intimidation and testified: "I'm assuming—I'm assuming Mike Yoffee." Because he perceived the screw's removal as a veiled threat, plaintiff did not report it for fear of reprisal. Sometime later, plaintiff stated that Yoffee entered plaintiff's office and declared: "I am going to pick on you."

Further, plaintiff testified that defendant's employees engaged in prolonged and frivolous staring at him which constituted "visual harassments." The visual harassments were conducted by five employees, including Yoffee and Clark. In one instance, plaintiff explained that when leaving work around 5:00pm, he walked by Yoffee. Yoffee silently stared at plaintiff as plaintiff walked past him and he did not respond to plaintiff's salutation. In another instance, plaintiff reported that Yoffee stared at him during their citizenship discussion on January 6, 2023. Further still, plaintiff stated that Yoffee stared at him while the two discussed Hartman's comments regarding his internship extension.

In a separate incident, plaintiff experienced visual harassment from Yoffee, Susan Cornell, Samara Rosenberg, and one other unnamed employee. According to plaintiff, the trio of Yoffee, Cornell, and Rosenberg entered his office looking for a "box named seven." Rather than search for the box (that may or may not have existed), plaintiff stated the trio continually looked at his face and stared at him. They soon left and approximately five minutes later another

7

employee arrived looking for the same box.  According to plaintiff, the employee used the box as an excuse to stare at plaintiff.

Plaintiff contends that he also suffered verbal harassments.  Particularly, Clark approached plaintiff and asked plaintiff what he was working on.  No more than five minutes later, plaintiff fielded the same question from Cornell.  Yoffee also effected verbal harassments by referring to defendant and its employees collectively as "we."  Plaintiff perceived this as an attempt to ostracize him.

Next, plaintiff articulated that defendant engaged in physical harassment in two instances.  First, defendant rearranged the boxes in plaintiff's office.  The boxes were property of the union and contained old union files.  Plaintiff estimates the boxes were moved three times.  Plaintiff considered shuffling the boxes a form of harassment orchestrated to impact him emotionally because he had arranged the boxes in an orderly manner to complete his assignment.  He did not witness anyone move the boxes and he never received an explanation for their rearrangement.

Later, plaintiff experienced a physical unwanted contact from Cornell.  Plaintiff, Rosenberg, and Cornell were tasked with moving boxes from one office to another.  In this episode, plaintiff testified that Cornell had pretended to bend down and lift a box.  His back had been turned to her as this happened; thus he cannot confirm whether she lifted a box.  When she rose from a crouched position, her arm or elbow contacted plaintiff's buttocks.  She immediately apologized to plaintiff, and he remarked, "I looked at her, she was—she was afraid."  Doc. No. 42 at 23.  Plaintiff excused the transgression because, he assumed, "she's not—she's not doing anything with her mind.  Mike Yoffee always told her what to do." Id. at 25.

Finally, plaintiff testified that defendant engaged in email espionage.  He explained that he always logged out of his email after work.  One day, plaintiff opened his email to discover that his email had been opened.  Plaintiff stated that it was not possible that he had opened the

8

email the previous day.  This happened four or five times.  Again, plaintiff insisted Yoffee was the culprit.  He reasoned that as department head, Yoffee possessed the ability to enter any collective bargaining employee's emails.

Sometime in March of 2023, defendant realized that plaintiff had graduated from IUP.  As such, his student visa had expired and he no longer possessed authorization to work in the United States.  Plaintiff still lacks authorization to work in the United States.  Plaintiff continued working for defendant until March 20, 2023.  On that day, Yoffee escorted plaintiff to a meeting with Hartman and defendant's director of personnel, Chris Taylor.  Yoffee did not attend the meeting.  In the meeting, Hartman and Taylor presented plaintiff with the U.S. government's Form I-9 list of acceptable documents for establishing employment eligibility in the United States.  Defendant gave plaintiff three days to produce the required documents.

Plaintiff did not produce an acceptable document establishing eligibility.  Defendant sent plaintiff a letter on March 29, 2023, notifying plaintiff that his failure to produce documentation establishing eligibility to work in the United States had resulted in his internship being terminated on March 31, 2023.  Plaintiff has not secured long term employment with any other employer in the United States.  He attributed his inability to secure employment to the fact that he is not authorized to work in the United States.

Following his internship, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").  He alleged defendant discriminated against him on the basis of his national origin, harassed him because of his national origin, and unlawfully retaliated against him.  The EEOC transferred his charge to the City of Pittsburgh Commission on Human Relations.  The Commission issued a notice of finding on December 5, 2023, stating plaintiff's allegations were not supported by probable cause.  Further, the Commission found that defendant was not lawfully able to employ plaintiff.

9

The EEOC adopted the findings of the Pittsburgh Commission and issued notice of plaintiff's right to sue on December 21, 2023.

Defendant moves for summary judgment on several grounds.  First, plaintiff assertedly failed to produce evidence sufficient to demonstrate severe or pervasive workplace harassment.  As support, defendant shows that the incidents plaintiff alleges as harassment are too infrequent to be pervasive and fall far short of the standard for severe.  Further, plaintiff purportedly did not allege that the particular harassments were a direct result of his national origin.

Second, plaintiff assertedly failed to establish the necessary elements of a prima facie case of national origin discrimination or failure to hire.  Defendant presents two pieces of evidence to demonstrate plaintiff cannot advance these claims.  First, plaintiff supposedly never applied for the administrative position that he alleges defendant denied him.  Second, upon graduation plaintiff's student visa expired, so he lacked the authorization to work in the United States.  Consequently, from defendant's perspective plaintiff cannot demonstrate that he suffered an adverse employment action because he cannot show that he applied for a job for which he was qualified.

Plaintiff challenges the motion from multiple angles.  First, plaintiff asserts he substantially was qualified for the position that defendant gave to McKay.  As proof, he proffers his two master's degrees.  Further, plaintiff correctly notes that defendant challenges plaintiff's qualification for the position with Fourth Circuit precedence.  He reasons that while persuasive, this case law is not binding on this court. Thus, defendant assertedly cannot advance its position without binding support from this circuit.

Plaintiff maintains that he has conclusively disproved defendant's articulated reason for not offering him employment.  Having supposedly done so, plaintiff further reasons that he need not demonstrate that defendant's reasoning was pretextual.  Further, plaintiff maintains that he

10

has concretely demonstrated that defendant subjected him to a severe and pervasive hostile work environment. In support, plaintiff presents numerous instances of "harassments." Cobbled together, these numerous and seemingly innocuous instances constitute an orchestrated campaign of emotional harassment designed to alter the terms of plaintiff's employment through emotional distress.

It is well-settled that claims of discrimination are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). In order to prevail on a claim of intentional national origin discrimination, a plaintiff must prove that his or her national origin actually motivated or had a determinative influence in the adverse employment action in question. Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (citations omitted). This burden can be met by presenting either direct evidence of discrimination or indirect evidence that satisfies the three-step process known as the McDonnell Douglas paradigm.

Here, plaintiff seeks to establish claims of national origin discrimination through indirect evidence. Claims of national origin discrimination in violation of Title VII are evaluated pursuant to the McDonnel Douglas tripartite burden-shifting analysis. Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

11

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (citation omitted).

Under the indirect evidence approach, a plaintiff must present a prima facie case of discrimination.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  The main purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")).  A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors.  Id.  (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case.  Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case.").  The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination.  Waldron, 56 F.3d at 494.  Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.  Id.; see also Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978).

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action.  Keller, 130 F.3d at 1108.  The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility

12

assessment."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).  If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case.  St. Mary's, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment.  Jones, 198 F.3d at 410.  At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253.  At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason."  St. Mary's, 509 U.S. at 515.  This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-52 (1981)).

Here, plaintiff has failed to establish a prima facie case of national origin discrimination. To establish a prima facie case, the plaintiff must demonstrate (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature

13

and purpose of prima facie case). The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait. Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). In short, the plaintiff must be able to point to evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.

As a Saudi national, plaintiff was a member of a protected class. Beyond this, plaintiff cannot establish any other elements of a prima facie case. First, he was unqualified for the position he sought because he could not legally work in the United States. He holds out his post-graduate education as proof of qualification in an attempt to distract from the reality that he lacked legal authorization to work in the United States. "An F-1 visa is issued to an alien 'for the purpose of pursuing . . . a course of study' at, *inter alia*, a college or university." Grewal v. U.S. Citizenship and Immigration Services, 409 F. Appx. 598, 599 (3d Cir. 2011). In the workforce, "if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery[.]" Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 148 (2002).

Here, upon completing his degree plaintiff's F-1 student visa status expired. Plaintiff simply cannot work in the United States without a visa. What's more, plaintiff testified that he encountered this same obstacle with every successive employment application he pursued. It follows that no reasonable fact finder could conclude that without a visa plaintiff nevertheless was qualified for the position.

The evidentiary record also shows that plaintiff did not suffer an adverse employment action. It is axiomatic that a plaintiff must show an adverse employment action to advance a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie

14

case. . . This may be done by showing. . . that he applied and was qualified for a job for which the employer was seeking applications."); see also Burdine, 450 U.S. at  254 ("[t]he plaintiff must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified but was rejected under circumstances which give rise to an inference of unlawful discrimination.").   Yet the record here shows that plaintiff did not apply for the administrative position he stakes his discrimination claim on.  In fact, he lacked knowledge that the position had even been listed.  Further, defendant hired McKay while plaintiff continued his graduate program studies and worked as a student intern.  Given his visa status, plaintiff could not have accepted full-time employment even if he had applied.  Therefore, a reasonable fact finder can only conclude that plaintiff did not suffer an adverse employment action.

Finally, even if plaintiff had articulated a prima facie case under the first prong of McDonnell Douglas, plaintiff cannot meet his ultimate burden of establishing pretext.   Plaintiff insists that defendant failed to articulate a legitimate reason for not hiring plaintiff.  The second step of McDonnell Douglas requires defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection.  The employer satisfies this burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Plaintiff appears to overlook that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. 253.  Further, "the determination that a defendant has met its burden of production . . . can involve no credibility determination."  St. Mary's Honor Center, 509 U.S. at 509.

Here, plaintiff has advanced nothing more than his own credibility determination on the matter— when this court is not authorized to do so.  Plaintiff does not challenge defendant's

15

proffered reason—that plaintiff did not possess a legal right to work in the United States— as pretextual, and instead declares defendant's explanation patently insufficient. This is of course unavailing. The plaintiff bears the burden of persuasion to demonstrate the defendant's reasoning is merely pretext for or a form of discriminatory animus. Burdine, 450 U.S. at 256. The plaintiff may do so by directly showing that he suffered discrimination or by illustrating that the defendant's explanation lacks credence. Id. Plaintiff has chosen neither course of action. Instead, he declares defendant's explanation for hiring McKay inadequate and then opts not to prove discriminatory intent or pretext. By forgoing the opportunity to attack defendant's explanation, plaintiff has failed to establish that the record contains sufficient evidence to show he suffered national origin discrimination.

Next, plaintiff cannot establish that he suffered a hostile work environment. A plaintiff alleging a hostile work environment on the basis of national origin must establish that: (1) he suffered intentional discrimination because of his national origin; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same national origin in that position; and (5) the existence of *respondeat superior* liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-81.

It is well-settled that a plaintiff need not produce direct evidence of an actor's motivation for conduct that can be found to be discrimination. Abramson, 260 F.3d at 278. In this regard, it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Rather, "[t]he proper

16

inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to [his national origin]." Id. at 277.

In this context, a plaintiff is not "required. . . to demonstrate direct proof that [his] harasser's intent was to create a discriminatory environment." Id. at 278.  Instead, the intent to discriminate can be inferred from the entire context in question and the conduct of the actors involved.  Thus, "[r]egardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof the 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment." Id.  at 278-79.  In other words, "where . . . the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of [his protected trait], the first prong of the prima facia case is met." Id. at 279.

Here, plaintiff cannot satisfy any element of a hostile work environment claim.  First, he produces no evidence that the alleged harassment results from an intentional anti-Saudi Arabian animus.  He alleges among other things that Yoffee orchestrated a campaign of visual and verbal "harassments," loosed a screw from his desk, read his private email, asked and encouraged others to ask harassing questions such as "what are you working on," and masterminded Cornell's physical contact with his person.  Yet absent from these allegations are any mention or even a tenuous inference of an underlying anti-Saudi Arabia sentiment.  As the record is devoid of any evidence of Saudi Arabian animus, no reasonable jury could find that any of this conduct was directed toward plaintiff because of his national origin and ultimately that his workplace was permeated with national origin harassment.

17

Second, plaintiff cannot show that the alleged harassments collectively were severe or pervasive. The conduct alleged must be so severe or pervasive that it "could be viewed by a reasonable juror as sufficiently 'severe or pervasive' to support a hostile work environment claim. The 'severe or pervasive' standard requires conduct that is sufficient 'to alter the conditions of [the employee's] employment and create an abusive work environment." Moody v. Atlantic City Bd. of Ed., 870 F.3d 206, 214 (3d Cir. 2017) (citing Meritor, 477 U.S. at 67). Further, "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 215 (citing Clark Cty. Sch. Dist. V. Breeden, 532 U.S. 268, 270-71 (2001)).

No single harassment plaintiff alleges rises to a sufficiently severe level to satisfy this requirement. Whether a single incident in the workplace can rise to the level of severity needed to be actionable is a context-specific inquiry. Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017). But pursuant to the inquiry, the incident must "be extreme" for it "to amount to a change in the terms and conditions of employment" and serve the basis of a harassment claim. Id. (citing Faragher, 524 U.S. at 788).

No reasonable jury could find that the highlighted eye contact rises to such an extreme level of degradation that it altered the conditions of employment. Rather, a fact finder would be forced to recognize that it is commonplace for employees to engage in intermittent eye contact when conversing in the workplace. For example, counsel asked plaintiff, "he stared at you as part of the—'are you looking for citizenship discussion' on January 6, correct?" To which plaintiff replied "yes." Counsel continued: "[a]ll right. What other instances was he staring at you?" Plaintiff replied: "[w]hen he was explaining the issue related to my current internship. . . When

18

he was referring to the upstairs lady, he was referring to Ginger Hartman, but, yeah, he was staring." Clearly, no reasonable jury could find such an interaction to be severe harassment. Eye contact with the person to whom you are conversing is customary and even courteous in the workplace.

The other alleged instances of harassment likewise fall far short. Plaintiff testified that Yoffee instructed Cornell to pretend to lift a box and make purposeful contact with plaintiff's buttocks. Plaintiff provides no evidence to corroborate his theory. But one instance of such contact is not severe harassment in any event. Similarly, plaintiff alleges that Yoffee spied on plaintiff's email. But again, plaintiff produces no evidence to support his theory. And even if he had, a reasonable jury could not find this to be sufficiently severe because it is well established that employers routinely reserve the right to access an employee's company-owned email account. Moreover, defendant has presented evidence that shows Yoffee did not possess the capability to read other employee's emails and plaintiff has not contradicted this showing.

Plaintiff also testified that an unknown employee disorganized boxes he had organized. When asked by counsel how an instance of harassment that impacted him could be drawn from this, plaintiff testified: "[i]t impacted me emotionally, yes." Counsel pressed further: "[i]t emotionally impacted you by making it more difficult to do your work?" Plaintiff responded, "[n]o, no, no, not affected in my work properly." Doc. No. 46 at 33. In other words, not only is such an incident not severe, but plaintiff has stipulated that it did not affect his ability to work. Clearly, if the conduct did not affect his ability to work, no fact finder could determine that this aspect of defendant's conduct altered the terms or conditions of plaintiff's employment.

Plaintiff likewise fails to establish that defendant subjected him to a pervasively hostile work environment. The workplace conduct underlying a hostile work environment claim is not to be measured in isolation. Rather, it must be assessed "by looking at all the circumstances."

19

Clark County, 532 U.S. at 270.  In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "individual pieces of evidence alone," but must "view the record as a whole picture."  Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)).  This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario."  Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Here, plaintiff attempts to illustrate an environment in which defendant's employees constantly needled him with seemingly innocuous and inconspicuous harassment that compounded into pervasive workplace harassment.  This is unavailing.  No reasonable jury would find that occasional eye contact amounts to harassment.  Second, a reasonable jury would not take umbrage with curious coworkers inquiring into plaintiff's current project.  Third, the record is clear that defendant treated plaintiff fairly and consistently relative to his co-intern.  Both interns were told to cease working for the month of December.  What's more, the record indicates plaintiff worked more hours and defendant paid plaintiff a higher hourly wage than co-intern Johnson.

Continuing further, alleged incidents such as plaintiff's French assignment, the email espionage, and the missing screw cannot substantiate a pervasively hostile work environment.  And this is so whether considered separately, in combination with each other or in combination with all other alleged forms of hostility.  Not only does plaintiff neglect to establish any connection between his each of his allegations and his Saudi nationality, but a reasonable jury would be forced to find that the events merely reflect forms of common behavior found in a traditional office environment.  In other words, plaintiff cannot show that defendant marred

20

plaintiff's employment with insidious harassment.  Consequently, plaintiff cannot establish a severe or pervasive hostile work environment.

As plaintiff has failed to proffer sufficient evidence to establish that he suffered intentional anti-Saudi Arabia discrimination and/or a severe or pervasively hostile work environment, the court need not analyze the additional elements of a hostile work environment claim.  Plaintiff cannot proceed with a workplace harassment claim based on national origin and defendant is entitled to summary judgment.

For the forgoing reasons, defendant's motion for summary judgment will be granted.  An appropriate order will follow.

Date: March 25, 2026

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     Israel Schwartz, Esquire
        Stephen T. O'Hanlon, Esquire
        Michael J. Healey, Esquire
        Nathan L. Kilbert, Esquire

        (*Via CM/ECF Electronic Mail*)

21